In the Matter of ROBERT M. WEICHERT, an Attorney, Respondent. NEW YORK STATE BAR ASSOCIATION, Petitioner

Fourth Department, January 18, 1973.

262

[redacted]

*George. P. Bluhm* for petitioner.

*Robert M. Weichert,* respondent in person, and *Paul R. Shanahan* for respondent.

*Per Curiam.* Respondent was admitted to the practice of law in this State on June 27, 1961. On May 17, 1972 the New York State Bar Association filed a petition on notice to respondent, charging him with several acts of professional misconduct, and respondent served a general denial thereof. Upon order of this court the issues thus presented were heard before a Referee appointed for that purpose.

Four series of transactions are involved in this proceeding:

I. TAX CERTIFICATES OF THE VILLAGE OF BALDWINSVILLE.

Respondent instituted foreclosure of 1965 tax certificates of the Village of Baldwinsville which he had purchased. The village and the County of Onondaga interposed answers and other defendants appeared but waived notices except notices of sale and surplus money proceedings. Respondent moved before Justice O'CONNOR for summary judgment and asked him to declare the lien priorities. On April 14, 1968 Justice O'CONNOR granted the motion in part and directed that a Referee be appointed to compute the liens but ordered that all questions of priorities of liens and payments from the proceeds of sale be left for determination on application for confirmation of the sale. On May 13, 1968 respondent made an ex parte application to Justice ARONSON without notice to the Village of Baldwinsville, the County of Onondaga or anyone, and he had the order of Justice O'CONNOR vacated. On August 19, 1968 respondent

secured an ex parte judgment of foreclosure and sale from Justice Aronson based upon an affidavit that no answer had been interposed and on an affidavit of regularity which he induced another lawyer to sign; and the lien priorities were determined in that judgment. Pursuant to the judgment a sale was had and the properties were bid in by the Village of Baldwinsville. Upon motion for confirmation of the sale the attorney for the village learned that Justice O'Connor's order had been vacated and Justice Aronson's judgment had been granted determining priorities without notice. The village and county thereupon opposed confirmation, and Justice Aronson vacated and declared void all proceedings subsequent to Justice O'Connor's order of April 14, 1968.

The finding of the Referee that respondent engaged in professional misconduct by knowingly and without notice to interested parties entitled to notice and in violation of his duty of disclosure to the court, submitting to the court an incorrect and misleading affidavit and obtaining an ex parte order thereon prejudicial to the rights of parties to the litigation, is supported by the record and should be confirmed. Respondent violated canons 22 and 29 of the Canons of Professional Ethics. In, *Matter of Schildhaus* (23 A D 2d 152, 155-156) the court wrote: " It is unprofessional for a lawyer as ' an officer of the law charged * * * with the duty of aiding in the administration of justice ' to engage in practices having a tendency to mislead the court. * * * An attorney is to be held strictly accountable for his statements or conduct which reasonably could have the effect of deceiving or misleading the court in the action to be taken on a matter pending before it. The court is entitled to rely upon the accuracy of any statement of a relevant fact unequivocally made by an attorney in the course of judicial proceedings." (See, also, *Matter of Neuwirth,* 39 A D 2d 365, 368.)

II. Dickquist Restaurant Matter.

During the years 1965 through 1967 respondent performed legal services for Charles and Shelley Dickquist, husband and wife. In 1967 he represented them when Charles transferred a one-half interest in his restaurant business to Shelley, but left the liquor license in his own name. In April of 1968 he represented Shelley in the institution of a divorce action against Charles. While that action was still pending, in September, 1968 he represented both Charles and Shelley in the transfer by Charles to Shelley of his remaining one-half interest in the restaurant and the restaurant lease, but he did not transfer Charles'

liquor license to Shelley; instead he made application for renewal of that license in Charles' name, although Charles had then conveyed all of his interest in the restaurant to Shelley. Shelley then ran the business as sole proprietor. Respondent encouraged her to incorporate the restaurant business, offering in such case to "put some money" into the business to help its financial condition. Shelley signed in blank a legal-sized paper on respondent's representation that it would be used to incorporate the business. On or about October 1, 1968 respondent brought one Bersani to the restaurant to help oversee its operation, and shortly thereafter advised Shelley that she would have a weekly salary from the business. Respondent and Bersani made application for renewal of the liquor license in the name of Merchants Special Products, Inc., a corporation which respondent had organized prior to 1968 and in which he was sole stockholder. In November, 1968 respondent told Shelley that she was only an employee in the business and had no interest in it, and he "fired" her from it. She then learned for the first time that respondent held a document signed by her transferring the business to Merchants Special Products, Inc. and that Bersani and respondent were the stockholders thereof and claimed to be, through that corporation, the exclusive owners of the restaurant business. Moreover, in the transfer papers Shelley continued obligated for all debts of the restaurant and for payment of the monthly rent on the restaurant lease for the balance of its term. During this time respondent had continued to represent Shelley in other matters in which she was involved. At no time did respondent advise Shelley that his interests were inimical to hers and that she should obtain other counsel, nor did he advise her of the effect of the documents which she signed transferring the business to a corporation of which he was at that time the sole stockholder.

Thereafter Shelley obtained other counsel who instituted legal action against respondent and eventually obtained an order and judgment returning the restaurant to her and declaring her to be the owner thereof.

The finding of the Referee that respondent engaged in unprofessional conduct in entering into a business transaction with his client, Shelley, and acquiring personally and through his corporation divergent interests in her property without disclosing to her the import of those transactions and without advising her to secure other counsel, is amply supported by the record and should be confirmed. Respondent violated canons 6, 10, 29 and 32 of the Canons of Professional Ethics.

## III. Enterprise Flying Park, Inc.

In the spring of 1970 respondent represented one Anklin, a principal stockholder in Enterprise Flying Park, Inc., owner of a private airport. Anklin wished to sell 100 shares of stock in the corporation for $75,000 and advertised it for sale. In April respondent took a mortgage on the corporate real estate in the sum of $6,000. In May, 1970 respondent and Anklin went to New York City and negotiated with one Hamel, a prospective buyer, and his attorney, Elliott Miller. They represented to Hamel and Miller that the real property of the corporation was "clear" except for a first mortgage thereon held by a bank; and Hamel delivered a check for $50,000 to respondent in escrow to hold until certain things were accomplished, including obtaining the indorsement of the necessary stock certificate by Mrs. Anklin. The next day, in violation of the escrow agreement, respondent released the check to the corporation, which cashed it and paid its indebtedness to respondent therefrom. Months later, after repeated demands the stock was obtained by respondent and forwarded to Hamel. By that time, however, Hamel had learned that representations made by Anklin and respondent concerning the corporation's financial status were untrue in many respects; and he retained Syracuse counsel to aid in rescinding the transaction. He was eventually able to obtain a settlement of rescission, and the corporation and respondent made repayment to him.

The Referee's finding that respondent engaged in professional misconduct in violating the escrow agreement with respect to the $50,000 and in aiding his client to obtain the deposit of the $50,000 thereunder by withholding the true information of the financial condition of Enterprise Flying Park, Inc., is fully supported by the record and should be confirmed. Respondent violated the Code of Professional Responsibility (DR 1-102 [A] [4]; DR 7-102 [A] [3]).

## IV. Action by Carpenter v. Sliva.

In 1966 Earley S. Carpenter retained respondent to represent him on his claim for a one-half interest in a former partnership business which he had conducted with one Sliva, which business was incorporated in 1959 and was sold by Sliva in 1965 without payment of any of the proceeds to Carpenter. At that time Carpenter made payment of $250 to respondent on his retainer, and respondent instituted action for Carpenter against Sliva in Supreme Court, Oswego County. The case reached the trial calendar in November, 1967, went over the

term two or three times and then onto the general docket on December 8, 1968 from which, after more than a year, it was stricken under CPLR 3404. In the meantime, in September, 1968 Carpenter paid to respondent an additional $250 to apply upon services in the action.

Because of respondent's lack of progress in the case, early in 1970 Carpenter went to see the Clerk of the Supreme Court in Oswego and learned that the case had been stricken from the calendar. He then spoke to respondent about it and respondent said that he would have the case restored to the calendar. He made application therefor in May and June, but restoration was denied. When claimant contacted respondent about the case in September, 1970 respondent advised him of his failure to get the case restored but offered to appeal the denial of his application if Carpenter would pay him an additional $500. Carpenter paid that sum to respondent who then did appeal from the order denying restoration; but the order was affirmed. Respondent admits that when he accepted the additional $500 fee he understood that the Statute of Limitations had run at least upon part of Carpenter's claim.

The record supports the findings of the Referee that Carpenter had, prima facie, a meritorious cause of action against Sliva and that respondent thought so; that by respondent's dilatory conduct the case was stricken from the calendar; that although the Statute of Limitations had run on the cause of action, in October, 1971 respondent advised Carpenter that he had a right to commence another action for the same relief; that respondent engaged in professional misconduct in failing diligently to pursue the action on the Oswego court calendar and allowing it to be stricken and the Statute of Limitations to run against his client's claim; in failing truthfully to advise his client of the facts and merits of the application to restore it; and in unconscionably exacting a fee of $500 in a vain effort to reverse the order denying restoration of the case to the calendar when the case was stricken by reason of his own neglect. Respondent has violated the Code of Professional Responsibility (DR 6-101 [A] [2] and [3]) and canons 8 and 32 of the Canons of Professional Ethics.

For his professional misconduct as above related respondent should be disbarred.

GOLDMAN, P. J., MARSH, WITMER, MOULE and HENRY, JJ., concur.

Order of disbarment entered.